**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION**

| | |
|---|---|
| WILLIAM STARBUCK, <br><br> Plaintiff, <br><br> vs. <br><br> RJ. REYNOLDS TOBACCO COMPANY, *et al.*, <br><br> Defendants. | No. 3:09-CV-13250-WGY-HTS <br><br> **MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT PM USA'S MOTION FOR RECUSAL OF THE TRIAL JUDGE** |

_____

I have been designated as a visiting judge to retry this "*Engle* progeny case," and pending motions have been assigned to me. This case is before me on the October 31, 2014, Motion For Recusal Of The Trial Judge (docket no. 133) by defendant Philip Morris USA Inc. (PM USA). PM USA seeks my recusal, which I respect is its right, from any proceedings in this case or future *Engle* progeny cases pursuant to 28 U.S.C. § 455(a). The plaintiff has filed no timely response.

PM USA's Motion For Recusal is based primarily on its characterization of comments that I made in the Fall/Winter 2013 issue of Voir Dire, in an article entitled *Obituary: The American Trial Lawyer, Born 1641—Died 20??* (*Obituary*). PM USA correctly states that, in that article, I portrayed the American Trial Lawyer (ATL) as an heroic figure who was "more responsible for our enduring freedoms and the enforcement of our nation's laws than any other," *Obituary* at 9, and that I then opined,

> American products, from airplanes to scalding coffee, pharmaceutical drugs, and scores of others, are safer and kill and maim far fewer Americans. *Hundreds of thousands of*

> *lives have been spared from tobacco-related deaths, and billions have been saved in health care costs.*

*Obituary* at 9 (emphasis added). PM USA states, also correctly, that I then contrasted the ATL with "American Litigators" (ALs), characterizing the latter as "paper tigers," and "fraud[s]," who "bill endless hours for developing untested and unrealistic trial strategies," and who "never work alone, always traveling in packs." *Id*. at 10. PM USA contends that these comments demonstrate that these are the precise circumstances in which § 455(a) requires my recusal, because I have publically declared the view that lawsuits like this one, and the lawyers who bring them, are the saviors of hundreds of thousands of lives, as well as billions of dollars in health care costs. PM USA argues that, in light of these comments, a reasonable disinterested lay person would be justified in doubting whether I could be impartial in cases involving these defendants.

The Eleventh Circuit Court of Appeals recently summarized the requirements for recusal under § 455(a), as follows:

> In relevant part, 28 U.S.C. § 455(a) provides that "[a]ny … judge … of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned." In keeping with the aim of "'promot[ing] confidence in the judiciary by avoiding even the appearance of impropriety whenever possible,'" *United States v. Patti*, 337 F.3d 1317, 1321 (11th Cir.2003) (quoting *Liljeberg v. Health Servs. Acquisition Corp.*, 486 U.S. 847, 865, 108 S.Ct. 2194, 100 L.Ed.2d 855 (1988)), recusal under § 455(a) turns on "whether an objective, disinterested, lay observer fully informed of the facts underlying the grounds on which recusal was sought would entertain a significant doubt about the judge's impartiality." *United States v. Scrushy*, 721 F.3d 1288, 1303 (11th Cir.2013) (citations and internal quotation marks omitted).

*In re Moody*, 755 F.3d 891, 894 (11th Cir. 2014).

Read in isolation, the comments on which PM USA relies might present a colorable claim for recusal. The effect of the comments read in isolation is not the standard, however. The question is "'whether an objective, disinterested, lay observer *fully informed of the facts underlying the grounds on which recusal was sought* would entertain a significant doubt about the judge's impartiality.'" *Id.* (emphasis added) (quoting *Scrushy*, 721 F.3d at 1303). For reasons known only to PM USA, its brief does not provide full information about the facts or context of the comments in question to evaluate the recusal question properly.

The full facts include the following additional circumstances. First, in the article in question, I did not focus solely on the effect of the ATL on tobacco litigation or even products liability litigation. Rather, I also observed that, because of the efforts of the ATL,

> Civil rights and liberties are more fully enjoyed. Minorities are more fully integrated into our nation's government, schools, jobs, and public accommodations. Air and water are cleaner. Roads, highways, hospitals, doctors' offices, and facilities for the aged and mentally and physically disabled are much safer. Individuals who have been bilked out of billions of their life savings in fraud schemes have obtained significant relief, as have stock holders in massive securities fraud cases.

*Obituary* at 9. Second, I did not give one-sided praise to plaintiffs' attorneys in products liability cases, as PM USA seems to suggest. Rather, in close proximity to the comments on which PM USA relies, I also observed, "Corporations and individuals falsely accused of negligence, defamation, infringing others' intellectual property, and harming others in untold ways have been vindicated [by the ATL]." *Id.* at 9. Third, I certainly did not intend—and I doubt that any lay observer would necessarily assume—that I was talking about any *Engle* progeny cases, such as this one, when I commented that the ATL had saved hundreds of thousands of Americans from "tobacco-related deaths" and billions in

3

health care costs. Rather, among the other well-known products liability cases to which I referred, I was referring to, and a lay observer is far more likely to have understood that I was referring to, the well-publicized 1998 Tobacco Master Settlement Agreement. *See, e.g.,* http://academic.udayton.edu/health/syllabi/tobacco/summary.htm (last visited 11/17/14). Third, my comments on the health risks and costs of tobacco use and the role of the ATL in reducing them by no means reflected an idiosyncratic or exaggerated view, but were based, instead, on a host of publicly available information, including information from government studies, the Centers for Disease Control and Prevention (CDC), and scholarly publications. *See, e.g.,* U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, REDUCING THE HEALTH CONSEQUENCES OF SMOKING: 25 YEARS OF PROGRESS, A REPORT TO THE SURGEON GENERAL (1989); http://www.cdc.gov/tobacco/index.htm (CDC Smoking & Tobacco Use home page) (last visited 11/17/14); Robert L. Rabin, *The Tobacco Litigation: A Tentative Assessment*, 51 DEPAUL L. REV. 331 (2001-2002).

As to the more general context in which the comments were made, VOIR DIRE is by no means a products liability plaintiffs' attorneys' publication. It is a publication of the American Board of Trial Advocates (ABOTA), an association of legal professionals, including members from both the plaintiffs' and the defendants' sides of the bar, with the "primary purpose" of "preservation of the civil jury trial." *See* https://www.abota.org/index.cfm?&pg=History (last visited 11/17/14). ABOTA also has the more "general purpose" of "foster[ing] improvement in the ethical and technical standards of practice in the field of advocacy to the end that individual litigants may receive more effective representation and the general public be benefited by more efficient administration of justice consistent with time-tested and traditional principles of litigation." *See* https://www.abota.org/index.cfm?pg=Mission (last visited 11/17/14). Indeed, *Obituary* was first published in the Spring 2013 edition of LITIGATION, the journal of the Section

4

Of Litigation of the American Bar Association, *see* Mark W. Bennett, *Obituary: The American Trial Lawyer; Born 1641-Died 20??*, LITIG., Spring 2013, another publication plainly of interest to both the plaintiffs' and the defendants' sides of the bar, and republished, with permission, in VOIR DIRE.

Furthermore, I have provided "tobacco" defendants in cases actually before me with every opportunity to pursue their defenses. In *Wright v. Brooke Group Ltd.*, 114 F. Supp. 2d 797 (N.D. Iowa 2000), I granted in part and denied in part the motion by defendant cigarette manufacturers, including Philip Morris Incorporated, to dismiss a smoker's claims for failure to state claims upon which relief could be granted. At the defendants' request, I subsequently took the extraordinarily unusual step of certifying eight questions of Iowa products liability law, on which I had already ruled, to the Iowa Supreme Court, thus providing the defendants with "second bites at the apple." *See Wright v. Brooke Group Ltd.*, 652 N.W.2d 159 (Iowa 2002) (answering the certified questions consistent with my prior ruling). This is hardly an action taken by a trial judge with a bias against cigarette manufacturers.

In short, the comments on which PM USA relies to try to cast doubt on my impartiality, when considered by an objective, disinterested, lay observer *fully informed of their context* would not raise a significant doubt about my impartiality or any concern that I am biased against tobacco defendants or defendants in products liability cases. *In re Moody*, 755 F.3d at 894.

In a footnote, PM USA also refers to comments that I made in an email to counsel in a particular case, which PM USA characterizes as indicating my "distaste for large law firms":

> In my 35 years of experience in the legal profession I have almost always been considerably under whelmed by East Coast law firms. I am not impressed by inflated rates and even more inflated billing practices, 6 lawyer[s] to take a simple

> deposition, a total lack of civility, obstructionist discovery tactics at every turn, poor trial skills and unsurpassed arrogance. Also, not one lawyer could [ ] name a single state that borders Iowa.

*See* http://abovethelaw.com/2010/06/judge-of-the-day-judge-mark-bennett-of-iowa-is-underwhelmed-by-east-coast-law-firms/ (last visited 11/17/14).[1] PM USA overlooks the fact that I am just as willing to praise attorneys from "large law firms," when praise is due. In a recent products liability case, in which the defendants' lead attorneys were from a large law firm in Atlanta, Georgia, I had high praise for lead defense counsel:

> Lead defense counsel was always very forthcoming and extremely reasonable throughout the trial. He bent over backwards to accommodate both me and plaintiffs' counsel, even when plaintiffs' counsel made unreasonable requests. For example, when lead defense counsel informed me, prior to opening statements, that he would not be needing or using all of the time allocated to him for his opening, plaintiffs' counsel immediately requested that he be given the time to add on to the time for his opening—which was a request that I found incredibly zealous, but equally unreasonable. Before I rejected this request out-of-hand, I asked for lead defense counsel's position. Somewhat shockingly to me, he responded that the request by plaintiffs' counsel was fine with him.

---

[1] Just because this comment reflects my considerable factual experience does not, in my view, demonstrate any bias. Indeed, I have been a frequent invited guest CLE speaker at Defense Research Institute CLE programs. On its webpage, DRI bills itself as "the leading organization of defense attorneys and in-house counsel." I was also appointed by a prominent senior partner at the Washington, D.C., firm of Arent & Fox to be the Secretary of the ABA Labor and Employment Law Section, a 20,000+ member section dominated by large national firms who do employment defense litigation. I was the first non-fulltime law professor to be given this appointment. Just two weeks ago, I was a CLE speaker at an ABA meeting in Los Angeles and had dinner on three consecutive nights, at their invitation, with senior partners in large national law firms, all with several East coast offices, including Washington, D.C., offices.

> Consequently, I gave plaintiffs' counsel the extra time. Based on my extensive experience as a federal trial judge, I suspect not one out of a hundred trial lawyers on either side would have agreed to this. Lead defense counsel acted this way throughout the trial. I am very hard-pressed to believe that, given his [ü]ber cooperative nature and [ü]ber reasonable approach to issues that arose in trial, he would have intentionally misled anyone.

*Stults v. International Flavors and Fragrances, Inc.*, ___ F. Supp. 2d ___, 2014 WL 5390571, *3 (N.D. Iowa Oct. 23, 2014) (correcting misprint in Westlaw edition). Again, the comments on which PM USA relies, when considered by an objective, disinterested, lay observer *fully informed of the circumstances* would not raise a significant doubt about my impartiality. *In re Moody*, 755 F.3d at 894.

Furthermore, any attempt to liken my comments to those warranting recusal in the various cases on which PM USA relies, such as *Jenkins v. McCalla Raymer, L.L.C.*, 492 F. App'x 968 (11th Cir. 2012), and *Hathcock v. Navistar Int'l Transp. Corp.*, 53 F.3d 36 (4th Cir. 1995), is strained, at best. Objectively considered, in their full context and full circumstances, my comments simply do not indicate that I harbor a bias toward or against any litigant or group of litigants or for or against a particular legal claim or theory, or even against attorneys from large or small law firms.

PM USA is correct that "'[a]ny doubts must be resolved in favor of recusal.'" *In re Moody*, 755 F.3d at 895 (quoting *Patti*, 337 F.3d at 1321). What PM USA omits to mention, however, is the countervailing principle:

> Nevertheless, "there is as much obligation for a judge not to recuse when there is no occasion for him to do so as there is for him to do so when there is." *United States v. Burger*, 964 F.2d 1065, 1070 (10th Cir.1992) (internal punctuation and citation omitted). Indeed, "a judge, having been assigned to a case, should not recuse himself on unsupported, irrational, or

7

> highly tenuous speculation." *United States v. Greenough*, 782 F.2d 1556, 1558 (11th Cir.1986).

*In re Moody*, 755 F.3d at 895. I conclude that PM USA's request for my recusal is based on "highly tenuous speculation," and that, in these circumstances, I have an obligation *not* to recuse myself. *Id.*

THEREFORE, PM USA's October 31, 2014, Motion For Recusal Of The Trial Judge (docket no. 133) is **denied**.

**IT IS SO ORDERED**.

**DATED** this 17th day of November, 2014.

*[signature: Mark W. Bennett]*

_____
MARK W. BENNETT
U.S. DISTRICT COURT JUDGE
NORTHERN DISTRICT OF IOWA
VISITING JUDGE